*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *BROWN PONTIAC-OLDS, INC.,* | ) | |
| *d/b/a BROWN PONTIAC BUICK* | ) | |
| *OLDSMOBILE SUZUKI,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Docket No. 05-204-P-H* |
| | ) | |
| *GENERAL MOTORS CORPORATION,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO COMPEL ARBITRATION*

The defendant moves to compel arbitration of the claims asserted by the plaintiff in this action pursuant to the terms of an Agreement and Business Plan and incorporated Acquisition and Release Agreement. Defendant General Motor's Motion to Compel Arbitration (Docket No. 11) at 1. The plaintiff contends that the dispute is governed by dealer franchise contracts, which by virtue of 15 U.S.C. § 1226 may not be subject to arbitration in the absence of the agreement of all parties. Plaintiff's Memorandum in Opposition to General Motors' Motion to Compel Arbitration ("Opposition") (Docket No. 13) at 1. I recommend that the court grant the motion.

**I. Factual Background**

The complaint includes the following relevant factual allegations.

The plaintiff purchased an Oldsmobile and Pontiac dealership twenty years ago. Complaint (Docket No. 1) ¶ 5. By letter dated December 12, 2000 the defendant notified Brown of its intent to terminate all Oldsmobile franchises in the United States. *Id.* ¶ 7. Although for several years the defendant had planned to phase out the Oldsmobile franchises, it failed to advise the plaintiff of this

plan or decision until the December 2000 letter.  *Id.* ¶ 8.  As of December 12, 2000 the plaintiff was operating under a contract with the defendant  (the "Oldsmobile Sales and Service Agreement") which it had entered into as of November 1, 2000 and which was to expire on October 31, 2005.  *Id.* ¶ 9.  In discontinuing the Oldsmobile line, the defendant violated this agreement and Maine law.  *Id.* ¶¶ 10-11.

The plaintiff entered into negotiations with the defendant regarding its purchase of the local Buick franchise.  *Id.* ¶ 12.  The defendant's market area manager for the plaintiff told the plaintiff that the acquisition of a Buick dealership would give the plaintiff the opportunity to retain its former Oldsmobile clients.  *Id.* ¶ 15.  The plaintiff inquired whether the defendant had any plans to eliminate the Buick franchise and was assured by representatives of the defendant that it did not contemplate, intend or plan the discontinuation of the Buick line or Buick franchises.  *Id.* ¶ 16.  Brown relied upon these and other statements by the defendant in deciding to accept the defendant's proposal that it acquire the local Buick dealership.  *Id.* ¶ 17.  The plaintiff entered into an Agreement and Business Plan (Exh. 1 to Memorandum in Support of Defendant General Motors Corporation's Motion to Compel Arbitration ("Motion") (Docket No. 12)) with the defendant to acquire the local Buick dealer. *Id.*  As a result, the plaintiff made a substantial investment.  *Id.* ¶ 18.  The Agreement and Business Plan provided that in lieu of transition assistance and any future lost profits resulting from the loss of the Oldsmobile franchise, the plaintiff would accept an "inducement payment" of $150,500 from the defendant to be used to acquire assets of Clair Buick, the local Buick dealer, cancel the Oldsmobile Sales and Service Agreement and release the defendant from any and all claims or liabilities arising out of or connected with the Oldsmobile agreement.  *Id.*  The plaintiff spent an additional $165,000 to prepare its dealership for the addition of the Buick franchise.  *Id.* ¶ 19.

The plaintiff entered into a Buick Sales and Service Agreement as of October 3, 2001; the agreement expired on October 31, 2005.  *Id.* ¶ 20.   It entered into a Pontiac Sales and Service

Agreement as of November 1, 2000; that agreement also expired on October 31, 2005. *Id*. The Buick agreement, which was written by the defendant, specifies that it will be construed under Michigan law as a personal services contract. *Id*. ¶ 21. On March 24, 2005 the vice-president of General Motors North America sent an e-mail to all General Motors dealers which stated, in part, that the defendant was not discussing the elimination of any of its brands and was investing more heavily than ever in new production and marketing programs. *Id*. ¶ 28. Following this e-mail the defendant began to inform dealers that it planned to reduce the number and variety of models that it manufactured for the Buick and Pontiac lines. *Id*. ¶ 29. It informed Buick and Pontiac dealers that it was effectively going to combine the Buick, Pontiac and GMC franchises into one. *Id*. The defendant stated publicly than any dealer with a Buick, Pontiac or GMC franchise would need to acquire the franchises which it did not already have or sell its franchises so that there would be only one dealer housing all of these franchises in a given market. *Id*. ¶ 30.

The plaintiff immediately approached the local GMC dealer in an attempt to discuss acquiring the local GMC franchise or selling its Pontiac and Buick franchises. *Id*. ¶ 34. The local GMC dealer declined both options. *Id*. The plaintiff then requested that the defendant grant it an appointment as a GMC franchise. *Id*. ¶ 35. The defendant denied this request. *Id*. The defendant's changes to the Buick and Pontiac lines violates the Sales and Service Agreement, upon which the plaintiff reasonably relied. *Id*. ¶¶ 36-37. The defendant had decided long before the plaintiff's acquisition of the Buick line to phase out that line as a viable stand-alone franchise. *Id*. ¶ 38. The defendant did not inform the plaintiff of this fact. *Id*. The plaintiff's array of marketable models has been reduced to the point where it has no chance of fulfilling its responsibilities within its designated market area. *Id*. ¶ 39. The defendant's actions violate the Sales and Service Agreement and Maine law. *Id*. ¶¶ 42-43.

The complaint alleges that the defendant violated 10 M.R.S.A. § 1174 (Count I), breached the Buick Sales and Service Agreement (Count II), breached an implied covenant of good faith and fair dealing arising from the Buick Sales and Service Agreement (Count III), breached the Pontiac Sales and Service Agreement (Count IV), breached an implied covenant of good faith and fair dealing arising from the Pontiac Sales and Service Agreement (Count V), made negligent misrepresentations (Count VI) and committed fraud (Count VII).  Complaint ¶¶ 50-92.

## II.  Applicable Law

The defendant relies on the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*.  Motion at 6-11.  The plaintiff relies on the Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. § 1226.  Opposition at 3-16.  Basically, the parties disagree about which document or documents give rise to this proceeding.

The defendant focuses on the following language from the Agreement and Business Plan:

> 7.   Disputes – Arbitration.
> (a) Subject to the following provisions of this section, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Claims") .
> (b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Claims.

Agreement and Business Plan, Terms and Conditions § 7.

The plaintiff contends that its claims all arise from the Buick Sales and Service Agreement and the Pontiac Sales and Service Agreement, both of which it asserts were renewed by the parties on October 24, 2005.  Opposition at 1.  These agreements contain the following relevant clause:

> Dealer and General Motors recognize that it is desirable to resolve disputes in a fair, prompt, and cost efficient manner.  Therefore, except for the matters specified below, and except as otherwise specifically agreed

> upon in writing between Dealer and General Motors, Dealer and General
> Motors agree to mediate any dispute arising under this Agreement or
> applicable law using the General Motors Dispute Resolution Process then in
> effect . . . before using other remedies available under federal, state or local
> law. . . .  Mediation under the General Motors Dispute Resolution Process is
> mandatory, but mediation is not binding on the parties unless the parties agree
> upon a solution.  If a dispute is not resolved through mediation, Dealer and
> General Motors may agree to resolve this dispute through voluntary binding
> arbitration available under the General Motors Dispute Resolution Process.

General Motors Corporation Dealer Sales And Service Agreement(s) ("Franchise Agreements") (Exh.

A to Opposition), Standard  Provisions, Art. 16.

The FAA provides that an arbitration clause in a "contract evidencing a transaction involving

commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be

valid, irrevocable, and enforceable . . . ."  9 U.S.C. § 2.  When a contract contains an arbitration

clause, "doubts should be resolved in favor of coverage."  *Municipality of San Juan v. Corporación*

*para el Fomento Económico de la Ciudad Capital*, 415 F.3d 145, 149 (1st Cir. 2005) (citation and

internal punctuation omitted).  An order to arbitrate should not be denied "unless it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute."  *Id*. (citation omitted); *see also Unionmutual Stock Life Ins. Co. of Am. v.*

*Beneficial Life Ins. Co*., 774 F.2d 524, 528 (1st Cir. 1985).  This is particularly true where the

arbitration clause is "quite broad."  *San Juan*, 415 F.3d at 149.  An arbitration clause that defines its

scope to include "[a]ll claims, disputes and other matters in question arising out of, or relating to, this

Agreement or the breach thereof" is "facially broad in scope."  *Winterwood Farm, LLC v. JER, Inc.*,

327 F.Supp.2d 34, 39 (D. Me. 2004).  "The existence of a broad agreement to arbitrate creates a

presumption of arbitrability which is only overcome if it may be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *MSAD No.*

*68 v. Johnson Controls, inc.*, 222 F.Supp.2d 50, 55 (D. Me. 2002) (citation and internal punctuation omitted).

On the other hand, the statute cited by the plaintiff provides in relevant part:

> **(1) Definitions**
> For purposes of this subsection —
> * * *
> **(B)** the term "motor vehicle franchise contract" means a contract under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles.
>
> **(2) Consent required**
> Notwithstanding any other provision of law, whenever a motor vehicle franchise contract proves for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy.

15 U.S.C. § 1226(a).  The statute also provides that it is applicable to "contracts entered into, amended, altered, modified, renewed , or extended after November 2, 2002."  15 U.S.C. § 1226(b). The Pontiac and Buick Dealer Sales And Service Agreements to which the plaintiff refers were signed, apparently in renewal, by the defendant's regional general manager on October 24, 2005. Franchise Agreements at 1.

## III.  Discussion

The defendant asserts that the allegations in the complaint "arise under, or at the very least relate to, the Agreement and Business Plan and incorporated Acquisition and Release Agreement," thereby making arbitration of all of the claims mandatory.  Motion at 8.  I find the matter to be much less clear, because the plaintiff has taken pains to allege Counts I-IV of its complaint in terms that are tied directly and only to the Sales And Service Agreements.  Complaint ¶¶ 50-72.  The defendant refers specifically to paragraphs 17-19 and 82-83 of the complaint as "examples" of allegations that

arise under or relate to the Agreement and Business Plan. Motion at 4-6. Those paragraphs relate to Count VI, which alleges negligent misrepresentation. That count, and Count VII, which alleges fraud, do relate to the Agreement and Business Plan. There is not reasonable interpretation of those counts that could find those claims to be fully independent of that document.

The Agreement and Business Plan clearly is not a motor vehicle franchise contract within the definition of 15 U.S.C. § 1226 if for no other reason because it was executed before that statute took effect. *See* 15 U.S.C. § 1226(b). The plaintiff does not attempt to argue otherwise. Rather, it contends that the Agreement and Business Plan does not apply to the current dispute, because it is a "side" agreement which "acknowledged Brown intended to acquire a Buick franchise," and "Congress intended both agreements to be governed by" section 1226. Opposition at 8. It cites *Arciniaga v. General Motors Corp*., 2005 WL 3008450 (S.D.N.Y. Nov. 10, 2005), in support of its position. *Id*. However, that case involved a dealer sales and service agreement and a stockholders agreement under the terms of which General Motors provided most of the capital for the purchase of a dealership business and received preferred stock and agreed that the individual owner could redeem the stock under certain conditions. *Arciniaga* at *1. The court found that the stockholder agreement, which included a mandatory arbitration clause, fell within section 1226's definition of a motor vehicle franchise contract. *Id*. at *2. The Agreement and Business Plan in this case cannot be forced into that mold. It does not involve the acquisition of stock by General Motors and there is no indication in the record that the $150,500 inducement payment provided by General Motors provided "most" of the capital for the plaintiff's acquisition of the Buick assets from Clair Buick. *See generally* Agreement and Business Plan. It cannot be said, as the *Arciniaga* court found with respect to the stockholders agreement in that case, 2005 WL 3008450 at *2, that the Agreement and Business Plan "is not strictly a franchise agreement in form but closely resembles one in substance." Nor is the Agreement and

Business Plan, from all that appears, a "non-negotiated side contract[] . . . such as those governing dealer finance disputes and incentive disputes." *Id*. at *3.  Nowhere in the Agreement and Business Plan does the defendant sell motor vehicles to the plaintiff or authorize the plaintiff to repair and service its vehicles, the definition of a motor vehicle franchise contract under section 1226.  15 U.S.C. § 1226(a)(1)(B).  To the extent that *Arciniaga* is deemed by the district judge not distinguishable from the present case, I reject its conclusion that decisions from other courts that differ "have interpreted the ADDCA too narrowly."  2005 WL 3008450 at *3.

The defendant has cited three unreported decisions which, while not on all fours with the instant case, are sufficiently similar to provide persuasive authority.  In  Memorandum and Order ("Order"), *Tom Naquin Chevrolet, Inc. v. General Motors Corp.*, Cause No. 3:02-CV-0714 RM (N.D.Ind. June 23, 2003) (Exh. 3 to Motion), the plaintiff, which then sold only Chevrolet and Nissan vehicles, in June 2000 negotiated the purchase of an Oldsmobile-Cadillac dealership.  Order at 1. General Motors' approval of the change and its provision of $400,000 to Naquin to facilitate the change were governed by a written Agreement and Business Plan.  *Id*.  One day after executing this document, the parties executed a Dealer Sales and Service Agreement.  *Id*. at 2.  Naquin claimed that section 1226 protected it from the mandatory arbitration contemplated by the Agreement and Business Plan.  *Id*. at 9.  The court rejected this argument and held that Naquin's claims of losses caused by termination of the Oldsmobile franchise related to the Agreement and Business Plan and accordingly must be arbitrated.  *Id*. at 5-8, 11.[1]

---

[1] Chief Judge Miller also noted that the Dealer Agreement, executed before the effective date of section 1226, was not subject to that statute unless it had been modified after the effective date and that, even then, the statute could only reasonably have been intended to apply to controversies arising thereafter rather than before the modification.  Order at 10.  "[E]lse the statute would have a retroactive application that Congress clearly hadn't intended." *Id*.  The plaintiff's argument raises a similar concern in this case, but it is a concern that the court need not reach.

In Order Granting Defendant's Motion to Compel Arbitration, *Today Chevrolet Co. v. General Motors Corp.*, Case No. C02-5642FDB (W.D. Wa. May 12, 2003) (Exh. 3 to Motion), the plaintiff, then a Chevrolet and Jeep dealer, negotiated the purchase of the assets of an Oldsmobile-Cadillac dealer in August 2000.  *Id*. at 1-2.  General Motors approved the transaction and agreed to pay the seller $250,000 to assist in the transaction.  *Id*. at 2.  Its consent and contribution were governed by a Relocation Agreement and Business Plan which included an arbitration clause essentially identical to the one in the Brown-General Motors Agreement and Business Plan.  *Id*.  Several weeks later, the parties entered into a Dealer Sales and Service Agreement with a dispute resolution clause essentially similar to that included in the Sales and Service Agreements in this case.  *Id*. at 3.  Six weeks later, General Motors notified Today of its decision to discontinue the Oldsmobile line.  *Id*.  Today brought suit for damages resulting from that decision.  *Id*.  The court found that Today's claims "at the very least, 'relate to' the Relocation Agreement" and that the Relocation Agreement was not a motor vehicle franchise contract for purposes of section 1226.  *Id*. at 4.

Finally, in Order and Reasons, *Trapp Chevrolet-Oldsmobile-Cadillac, Inc. v. General Motors Corp.*, Civil Action 02-0158, Section "T" (1) (E.D.La. May 31, 2002) (Exh. 3 to Motion), the plaintiff, initially a Chevrolet dealership, purchase an Oldsmobile-Cadillac dealership in June 1999 pursuant to an Assumption Agreement with General Motors.  *Id*. at 1-2.  In August 1999 the plaintiff entered into a Dealer Sales and Service Agreement with General Motors covering the new lines which contained a voluntary arbitration clause.  *Id*. at 2.  When General Motors announced that it was phasing out the Oldsmobile line, the plaintiff sought damages in accordance with the terms of the Dealer Sales and Service Agreement.  *Id*. at 2-3.  General Motors sought an order compelling arbitration under the terms of the Assumption Agreement, *id*. at 3, and the court held that the "broad" arbitration clause in that document, which again was essentially similar to the clause in the Agreement

and Business Plan in the instant case, covered the claims of misrepresentation and breach of the Dealer Sales and Service Agreement, *id*. at 5-9.

I find the reasoning of these courts persuasive.  *See also Pride v. Ford Motor Co*., 341 F.Supp.2d 617, 619-22 (N.D.Miss. 2004) (Stock Redemption Plan/Dealer Development Agreement containing mandatory arbitration clause not a motor vehicle franchise contract under section 1226). The plaintiff has made no attempt to show that the agreement to arbitrate in the Agreement and Business Plan was invalid.  At least portions of the present dispute fall within the scope of that agreement.  Nothing further is required.  See *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).  Because some of the plaintiff's claims are subject to mandatory arbitration, all of its claims should be submitted in the first instance to an arbitrator.  *Naquin* at 3 (citing *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998)).  *See also Puerto Rico Tel.  Co. v. U.S. Phone Mfg. Corp.*, 427 F.3d 21, 26-27 (1st Cir. 2005) (noting that Supreme Court case law requires that any doubts concerning scope of arbitrable issues be resolved in favor of arbitration).

## IV.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to compel arbitration be **GRANTED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of February, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge